## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BASHAR ZIED | Case No.: 1:26-cv-02311 |
| Plaintiff, | |
| v. | |
| EQUIFAX INFORMATION SERVICES, LLC | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Bashar Zied ("Plaintiff") by and through the undersigned counsel, brings this action against Equifax Information Services, LLC ("Defendant" or "Equifax") and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for

1

misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make

him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.

36570 (1970)] (emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.      The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

3

11.     Plaintiff's claims arise out of Defendant's blatantly inaccurate credit reporting, wherein the Defendant reported to Plaintiff's potential creditors that Plaintiff had no credit history or credit score.

12.     Accordingly, Plaintiff brings claims against the Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i, and failing to provide a full disclosure report upon receipt of a written request to do so, in violation of the FCRA, 15 U.S.C. § 1681g.

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14.     Plaintiff is a natural person residing in Yonkers, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Equifax is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of New York, including within this District. Equifax can be served at its registered agent for service Corporation Service Company at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

16.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

19.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### Factual Background

24.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

25.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

26.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28.     Defendant's consumer reports generally contain the following information:

(a)     Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)     Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)     Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)     Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

29.     Defendant obtains consumer information from various sources.  Some consumer information is sent directly to the CRA by furnishers.

30.     The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions.

31.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in Defendant's consumer reports.

32.     The information Defendant includes in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

33. FICO Scores are calculated using information contained in Defendant's consumer reports.

34. Defendant knows that FICO and other third-party algorithms (as well as the algorithms owned by CRAs) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

35. Defendant knows that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

36. DTI compares the total amount a consumer owes to the total amount a consumer earns.

37. The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

38. Defendant routinely reports inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

39. Defendant fails to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

40. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against Defendant for its inaccurate credit reporting.

41.     Thus, Defendant is on continued notice of its inadequate reporting procedures. Specifically, Defendant is on notice that its inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

42.     Defendant has received and documented many disputes from consumers complaining that Defendant reported inaccurate information about them.

## Plaintiff's Credit History

43.     Plaintiff is a young man who had decided to start responsibly building his credit in order to establish financial independence qualify for future credit opportunities.

44.     To that end, in or around November 2024, Plaintiff successfully applied for credit with Capital One.

45.     In or around August 2025, Plaintiff successfully applied for credit with Capital One again.

46.     Because Plaintiff had responsibly opened and maintained these accounts, he reasonably believed that he would qualify for additional credit opportunities, including an auto loan and a credit limit increase on his existing Capital One account.

## Plaintiff Applies for an Auto Loan with Capital One

47.     On or about October 24, 2025, Plaintiff applied for auto financing with Capital One.

48.     For Capital One to make a determination on Plaintiff's credit application, it would need to obtain copies of Plaintiff's credit files. Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain his credit files.

49.     Upon information and belief, Defendant sold a consumer report about Plaintiff to Capital One in relation to Plaintiff's credit application.

50.    On or about November 1, 2025, Capital One informed Plaintiff that his application for auto financing not be approved because it was unable to obtain the most recent information about his monthly payments from Defendant and that information was missing or unavailable from his Equifax credit file.

51.    Upon information and belief, Defendant, in the consumer report it sold to Capital One concerning Plaintiff, indicated that it was unable to locate Plaintiff's credit file, or, alternatively, indicated that Plaintiff had no credit accounts.

52.    Plaintiff was shocked and confused upon receiving the denial from Capital One, as he has diligently maintained his account with them.

53.    Upon information and belief, this denial directly resulted from Equifax failing to furnish Plaintiff's complete file and instead returning a fragmented or incomplete file, providing a false depiction of Plaintiff's credit history and activity.

54.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

**Plaintiff Applies for a Credit Increase with Capital One**

55.    Confused and worried about the auto financing denial from Capital One, Plaintiff endeavored to apply for a credit increase on his Capital One credit card.

56.    In or around early November 2025, Plaintiff applied for a credit limit increase on his Capital One credit card.

57.    For Capital One to make a determination on Plaintiff's credit application, it would need to obtain copies of Plaintiff's credit files. Plaintiff provided Capital One with his personal identification information, including his Social Security number, and authorized it to obtain his credit files.

10

58.    Upon information and belief, Defendant sold a consumer report about Plaintiff to Capital One in relation to Plaintiff's credit application.

59.    On or about November 4, 2025, Capital One informed Plaintiff that his application for a credit increase could not be approved because it was unable to obtain the most recent information about his monthly payments from Defendant and that information was missing or unavailable from his Equifax credit file.

60.    Upon information and belief, Defendant, in the consumer report it sold to Capital One concerning Plaintiff, indicated that it was unable to locate Plaintiff's credit file, or, alternatively, indicated that Plaintiff had no credit accounts.

61.    Plaintiff was shocked and confused upon receiving the denial from Capital One, as he has diligently maintained his account with them.

62.    Upon information and belief, this denial directly resulted from Equifax failing to furnish Plaintiff's complete file and instead returning a fragmented or incomplete file, providing a false depiction of Plaintiff's credit history and activity.

63.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

### Plaintiff's Initial Disputes with Defendants

64.    On or about November 5, 2025, confused by the reasoning for Capital One's denial of his credit increase, Plaintiff decided to contact Defendant and dispute over the phone.

65.    Upon information and belief, Plaintiff spoke with at least one representative of Defendant over the phone to dispute the inaccurate reporting.

11

66. Plaintiff further supplemented his dispute by mailing identifying information and supportive documents explaining his dispute to Defendant.

67. Upon information and belief, Defendant received Plaintiff's supporting dispute documents on or about November 8, 2025.

68. On or around November 8, 2025, Plaintiff received notification from a credit monitoring service that they could not find any information in relation to his Equifax account.

69. Plaintiff continued to dispute with Equifax over the phone from around November 9, 2025, through around December 7, 2025.

70. After Plaintiff pressed for escalation, he was eventually told that a file had been established and that the issue would be resolved within approximately thirty days, and he was provided a case number in connection with the matter.

71. Upon information and belief, Defendant has failed to establish restore Plaintiff's credit file or establish a new one as expressed to him.

72. Despite Plaintiff's continued disputes and reassurances from representatives of Defendant that his credit file would be restored, Defendant has not done so.

73. Equifax failed to conduct a reasonable reinvestigation of Plaintiff's disputes tendered in November 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Continued Credit Denials in November 2025**

74. Still desperate for financing, Plaintiff continued to apply for credit and loans.

75. In or around November 2025, Plaintiff applied for credit and/or loans with Lending Club and Upstart.

12

76. For Lending Club and Upstart to make a determination on Plaintiff's credit application, it would need to obtain copies of Plaintiff's credit files. Plaintiff provided Lending Club and Upstart with his personal identification information, including his Social Security number, and authorized it to obtain his credit files.

77. Upon information and belief, Defendant sold a consumer report about Plaintiff to Lending Club and Upstart in relation to Plaintiff's credit application.

78. In or around November 2025, Lending Club informed Plaintiff that his application for a credit not be approved.

79. Upon information and belief, the reason behind Lending Club's denial of Plaintiff's credit application was Defendant's continued inaccurate reporting.

80. In or around November 2025, Upstart informed Plaintiff that his application for a credit had been pre-approved, but at a much higher interest rate.

81. Upon information and belief, the reason behind Upstart's less favorable terms was Defendant's continued inaccurate reporting.

82. Upon information and belief, Defendant, in the consumer report it sold to Lending Club and Upstart concerning Plaintiff, indicated that it was unable to locate Plaintiff's credit file, or, alternatively, indicated that Plaintiff had no credit accounts.

83. Upon information and belief, each denial directly resulted from Equifax failing to furnish Plaintiff's complete file and instead returning a fragmented or incomplete file, providing a false depiction of Plaintiff's credit history and activity.

84. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

13

**Plaintiff Applies for a Loan with Citizens Bank ("Citizens")**

85.    Still needing credit, Plaintiff searched for other opportunities to earn financing.

86.    On or around December 7, 2025, Plaintiff applied for an iPhone loan through Citizens.

87.    For Citizens to make a determination on Plaintiff's credit application, it would need to obtain copies of Plaintiff's credit files.

88.    Upon information and belief, Defendant sold a consumer report about Plaintiff to Citizens Bank in relation to Plaintiff's loan application.

89.    Shortly after submitting his loan application, Citizens informed Plaintiff that his application for an iPhone loan could not be approved because information was missing or unavailable from his Equifax credit file.

90.    Upon information and belief, Defendant, in the consumer report it sold to Citizens concerning Plaintiff, indicated that it was unable to locate Plaintiff's credit file, or, alternatively, indicated that Plaintiff had no credit accounts.

91.    Plaintiff was shocked and confused upon receiving the denial from Citizens, as he has diligently maintained his account with them.

92.    Upon information and belief, this denial directly resulted from Equifax failing to furnish Plaintiff's complete file and instead returning a fragmented or incomplete file, providing a false depiction of Plaintiff's credit history and activity.

93.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

14

**Plaintiff Submits a Complaint to the Consumer Financial Protection Bureau ("CFPB")**

94.    Exhausted from continued denials and Defendant's failure to correct their reporting, Plaintiff decided to submit a complaint against Defendant with the CFPB.

95.    Plaintiff submitted two complaints against Defendant regarding their inaccurate reporting on or about December 6, 2025, and December 8, 2025.

96.    In his Complaints, Plaintiff explained that Equifax had failed to maintain his credit file, reported that he does not have a credit file to third parties, and failed to reasonably reinvestigate their inaccurate reporting upon receipt of Plaintiff's telephonic disputes.

97.    Plaintiff further explained that representatives of Equifax continued to give him inconsistent explanations regarding their inaccurate reporting of his credit file.

98.    On or abut January 29, 2026, Defendant responded to each of Plaintiff's CFPB complaints.

99.    In their response, Defendant failed to address their inaccurate reporting, instead suggesting that Plaintiff had not applied for credit recently or does not live in the United States and does not have a United States Social Security Number.

100.    Plaintiff was born in the United States and has maintained the same Social Security Number since his birth.

101.    Defendant took no further corrective action regarding their inaccurate reporting that Plaintiff does not have a credit file.

102.    Equifax failed to conduct a reasonable reinvestigation of Plaintiff's disputes tendered in December 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff Disputes with Defendant and Requests a Disclosure of His Credit File**

103.    Exhausted by Defendant's continued refusal to correct their inaccurate reporting, Plaintiff continued to dispute with Equifax directly.

104.    On or about January 12, 2026, Plaintiff submitted a written request to Equifax under 15 U.S.C. § 1681g seeking a full file disclosure of all information contained in his credit file, along with the sources of the information and a record of all entities that had obtained his credit report. Plaintiff enclosed all required identifying documentation, including his government-issued identification and Social Security card.

105.    On January 20, 2026, Plaintiff contacted Citizens Bank regarding the denial of his application for financing related to a consumer electronics purchase.

106.    During that communication, a Citizens Bank representative located Plaintiff's application using Plaintiff's identifying information, including his name, address, and the last four digits of his Social Security number.

107.    The representative informed Plaintiff that the application had been denied because the Social Security number provided in the application did not match the Social Security number associated with Plaintiff's credit file.

108.    The representative further confirmed that Citizens Bank relied on Equifax for purposes of credit verification.

109.    Plaintiff confirmed his full Social Security number with the representative, which matched the information contained in the lender's application records.

110.    The Citizens Bank representative advised Plaintiff that the discrepancy appeared to originate from Equifax's records and recommended that Plaintiff contact Equifax to correct the issue.

16

111.    On or about January 22, 2026, Plaintiff submitted a written dispute to Defendant via certified mail requesting that they correct their inaccurate reporting that he does not have a credit file. Plaintiff enclosed all required identifying documentation, including his government-issued identification and Social Security card.

### Defendant Equifax's Unreasonable Dispute Reinvestigation

112.    Upon information and belief, Defendant received both Plaintiff's credit file disclosure request and dispute.

113.    On or around February 19, 2026, Defendant responded to Plaintiff stating that they could not locate a copy of his credit report.

114.    Despite receiving Plaintiff's request with proper identification, Equifax failed and refused to provide Plaintiff with the full file disclosure to which he is entitled under the FCRA. Instead, Equifax sent a boilerplate response claiming it was "unable to locate credit information" due to allegedly insufficient identifying information or lack of a credit history, despite Plaintiff providing sufficient documentation to verify his identity.

115.    Thereafter, Defendant Equifax further failed to correct the problems affecting Plaintiff's credit file and continued to maintain that it could not locate a credit file associated with Plaintiff, despite Plaintiff's existing credit accounts and repeated notices of the error.

116.    Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered in January 2026, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

117.    Equifax failed to provide Plaintiff with a full file disclosure of his Equifax credit file upon receipt of a valid written request to do so, in violation of 15 U.S.C. § 1681g.

**Plaintiff Applies for Credit Card with Pentagon Federal Credit Union ("PenFed")**

118.    Still desperate to obtain credit, Plaintiff continued searching for viable options.

119.    Plaintiff learned that PenFed offers some of the most competitive interest rates on the market. Therefore, Plaintiff applied for a credit card with PenFed with the intention of building a credit relationship with the institution in order to apply for an auto loan in the future.

120.    On or about March 5, 2026, Plaintiff completed and submitted a Power Cash Rewards Credit Card application with PenFed.

121.    For PenFed to make a determination on Plaintiff's credit application, it would need to obtain copies of Plaintiff's credit files. Plaintiff provided PenFed with his personal identification information, including his Social Security number, and authorized it to obtain his credit files.

122.    Upon information and belief, Defendant sold a consumer report about Plaintiff to PenFed in relation to Plaintiff's credit application.

123.    Upon information and belief, Defendant, in the consumer report it sold to PenFed concerning Plaintiff, indicated that it was unable to locate Plaintiff's credit file, or, in the alternative, indicated that Plaintiff had no credit accounts and had a credit score of 0.

124.    Shortly after submitting his credit application, PenFed informed Plaintiff that his application for a credit increase could not be approved.

125.    In the notice provided to Plaintiff, PenFed stated that its decision was based, in whole or in part, on information obtained from a consumer report provided by Defendant.

126.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

18

**Plaintiff's Fragmented File**

127.    Despite its knowledge of Plaintiff's identity and credit history, Equifax engaged in violative conduct, returning incomplete, inaccurate, and fragmented information to multiple creditors and causing Plaintiff multiple credit denials.

128.    Despite Plaintiff's repeated efforts to correct the issues affecting his credit file, lenders continued to rely on information supplied by Equifax when evaluating Plaintiff's creditworthiness.

129.    Upon    information    and    belief,    Equifax    was maintaining fragmented credit files— fragmented, incomplete sub-files—on Plaintiff.

130.    Fragmented files occur when a CRA fails to properly match incoming data to an existing master file, resulting in multiple incomplete files for the same consumer.

131.    The CFPB has identified fragmented files as a common, predictable error affecting hundreds of thousands of consumers and resulting in missing tradelines and false zero scores.

132.    CRAs such as Equifax have long been on notice of the fragmented file issue.

133.    The recurrence of this identical error despite Plaintiff's disputes demonstrates that Equifax failed to implement or follow reasonable procedures to prevent known risks associated with file fragmentation.

134.    Equifax's creation and return of a fragmentary file for Plaintiff was a foreseeable consequence of inadequate matching procedures and failure to maintain proper post-dispute safeguards.

135.    As a result of Equifax's inaccurate reporting, Plaintiff suffered at least five credit denials from November 2025 through March 2026 and was unable to obtain credit he urgently needed to establish his financial independence.

19

**Plaintiff's Damages**

136.    Plaintiff reasonably believes that the Defendant continued to publish inaccurate information indicating that it could not locate or associate a credit file with Plaintiff, or otherwise failed to maintain Plaintiff's legitimate credit information within its records.

137.    As a result of Defendant's repeated reporting that Plaintiff did not have a credit score or credit file, and despite Plaintiff's efforts to dispute the same, the Defendant made it practically impossible for Plaintiff to continue to obtain credit.

138.    At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

139.    At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

140.    Defendant is aware of the shortcomings of its procedures and intentionally choose not to comply with the FCRA to lower its costs.  Accordingly, Defendant's violations of the FCRA are willful.

141.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, stress, humiliation, and embarrassment of credit denials.

142.    Plaintiff also incurred out-of-pocket financial losses while attempting to investigate and correct Defendant's reporting failures. These expenses include, but are not limited to,

20

approximately $90 for credit monitoring services and approximately $50–$70 in mailing, tracking, and documentation costs associated with submitting disputes, correspondence, and supporting materials to address the inaccuracies in Defendant's records.

143.    Moreover, Plaintiff suffered lost credit opportunities and was unable to obtain reasonable credit terms as a result of Defendant's failure to properly maintain and associate Plaintiff's credit file with his identifying information and their continued inaccurate reporting despite multiple disputes from Plaintiff.

144.    Plaintiff was denied multiple credit applications and, when credit was available, it was offered only at extremely unfavorable terms, including interest rates approaching or exceeding approximately 29% APR, making such financing economically unreasonable and effectively unavailable.

145.    Plaintiff was also unable to obtain financing to purchase a vehicle as planned and, as a result, was forced to rely on taxis for daily transportation, incurring approximately $300–$400 per month in transportation expenses.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendant Equifax)**

146.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

147.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

148.    On numerous occasions, Defendant prepared patently false consumer reports concerning Plaintiff.

149.    Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

150.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

151.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

152.    Plaintiff also incurred out-of-pocket financial losses while attempting to investigate and correct Defendant's reporting failures. These expenses include, but are not limited to, approximately $90 for credit monitoring services and approximately $50–$70 in mailing, tracking, and documentation costs associated with submitting disputes, correspondence, and supporting materials to address the inaccuracies in Defendant's records.

153.    Moreover, Plaintiff suffered lost credit opportunities and was unable to obtain reasonable credit terms as a result of Defendant's failure to properly maintain and associate Plaintiff's credit file with his identifying information. Plaintiff was denied multiple credit applications and, when credit was available, it was offered only at extremely unfavorable terms, including interest rates approaching or exceeding approximately 29.99% APR and in some

22

instances as high as 50% APR, making such financing economically unreasonable and effectively unavailable.

154.   Plaintiff was also unable to obtain financing to purchase a vehicle as planned and, as a result, was forced to rely on taxis for daily transportation, incurring approximately $300–$400 per month in transportation expenses. Plaintiff was likewise unable to obtain a $10,000 loan intended to assist his family business in buying out departing partners, which forced the family to borrow funds from a relative and caused additional financial strain and uncertainty.

155.   Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

156.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Equifax)**

157.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

158.   The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id*.

159.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

160.    On at least one occasion during the past year, Plaintiff disputed the inaccurate information with Defendant and requested that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the representation that Plaintiff didn't have a credit score or credit file reported by Defendant.

161.    In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

162.    The Credit Bureau Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

163.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

164.    Plaintiff also incurred out-of-pocket financial losses while attempting to investigate and correct Defendant's reporting failures. These expenses include, but are not limited to, approximately $90 for credit monitoring services and approximately $50–$70 in mailing, tracking, and documentation costs associated with submitting disputes, correspondence, and supporting materials to address the inaccuracies in Defendant's records.

165.    Moreover, Plaintiff suffered lost credit opportunities and was unable to obtain reasonable credit terms as a result of Defendant's failure to properly maintain and associate Plaintiff's credit file with his identifying information. Plaintiff was denied multiple credit applications and, when credit was available, it was offered only at extremely unfavorable terms, including interest rates approaching or exceeding approximately 29.99% APR and in some instances as high as 50% APR, making such financing economically unreasonable and effectively unavailable.

166.    Plaintiff was also unable to obtain financing to purchase a vehicle as planned and, as a result, was forced to rely on taxis for daily transportation, incurring approximately $300–$400 per month in transportation expenses. Plaintiff was likewise unable to obtain a $10,000 loan intended to assist his family business in buying out departing partners, which forced the family to borrow funds from a relative and caused additional financial strain and uncertainty.

167.    Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

168.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

25

## COUNT III
## 15 U.S.C. § 1681g
## Failure to Provide Full File Disclosure
### (Third Claim for Relief Against Defendant Equifax)

169.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

170.    Under 15 U.S.C. § 1681g, a consumer reporting agency must, upon request and with proper identification, "clearly and accurately disclose to the consumer:  (1) all information in the consumer's file at the time of the request; (2) the sources of that information;  (3) the identification of each person who procured a consumer report; and (4) the dates, original inquiries, and recipient entities that accessed the consumer report."

171.    A consumer's "file," as defined by 15 U.S.C. § 1681a(g), encompasses "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored. "The Ninth Circuit in *Shaw v. Experian Information Solutions, Inc.*, 891 F.3d 749, 759 (9th Cir. 2018), explained that this includes "all information on the consumer that is recorded and retained by a [CRA] that might be furnished, or has been furnished, in a consumer report on that consumer"(quoting *Cortez v. Trans Union*, LLC, 617 F.3d 688, 711–12 (3d Cir. 2010); citing *Gillespie v. Trans Union Corp.*, 482 F.3d 907, 909 (7th Cir. 2007)).

172.    On or about January 12, 2026, Plaintiff submitted a written request to Equifax pursuant to 15 U.S.C. § 1681g, seeking a full file disclosure of all information in his credit file, along with the sources of the information and a record of all entities that had obtained his credit report. Plaintiff provided sufficient documentation to verify his identity, including his government-issued ID and Social Security card.

173.    Despite this valid request, Equifax failed to provide the required full file disclosure, instead sending a boilerplate notice claiming it could not locate Plaintiff's credit information.

26

174.    By refusing to provide a complete and accurate disclosure, Equifax deprived Plaintiff of information necessary to identify the inaccurate entries in his file, trace the sources of those inaccuracies, and determine which third parties accessed his reports.

175.    Experian's failure to comply with 15 U.S.C.§1681g was willful, rendering it liable for statutory and punitive damages under 15 U.S.C.§1681n.

**PRAYER FOR RELIEF**

**WHEREFORE, P**laintiff prays that the Court enter a judgment awarding Plaintiff actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs and awarding Plaintiff such other and furth relief as the Court may deem appropriate and proper

**DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: March 20, 2026

/s/ David Pinkhasov
David Pinkhasov, NY # 705944
**CONSUMER ATTORNEYS**
68-29 Main Street
Flushing NY 11367
T: (718) 701-4605
F: (718) 247-8020
E: dpinkhasov@consumerattorneys.com

*Attorneys for Plaintiff*
*Bashar Zied*

27